# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| LYLA WEILAND, | ) | CASE NO. 1:17CV727 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Lyla Weiland, ("Plaintiff" or "Weiland"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends the

Commissioner's final decision be VACATED and the case REMANDED for further proceedings

consistent with this decision.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I.    PROCEDURAL HISTORY

In August 2014, Weiland filed applications for POD, DIB, and SSI, alleging a disability onset date of April 22, 2002 (later amended to January 1, 2013) and claiming she was disabled due to Type 1 diabetes, dyslexia, and mental abuse.[2]  (Transcript ("Tr.") 19, 47, 261, 306.)  The applications were denied initially and upon reconsideration, and Weiland requested a hearing before an administrative law judge ("ALJ").  (Tr. 211-217, 223-227, 228.)

On April 5, 2016, an ALJ held a hearing, during which Weiland, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 43-83.)  On December 1, 2016, the ALJ issued a written decision finding Weiland was not disabled.  (Tr. 19-34.)  The ALJ's decision became final on February 10, 2017, when the Appeals Council declined further review.  (Tr. 1.)

On April 7, 2017, Weiland filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 15.)  Weiland asserts the following assignments of error:

(1)    The ALJ erred by failing to properly evaluate the impact of Plaintiff's uncontrolled Type 1 Diabetes Mellitus.

(2)    The ALJ failed to follow the Treating Physician Rule in accordance with 20 CFR § 404.1527.

(Doc. No. 14.)

---

[2] Weiland filed a prior application for POD, DIB and SSI on August 2, 2010, which was denied initially and upon reconsideration. (Tr. 19.  After conducting a hearing, the ALJ issued a written decision on December 31, 2012, finding Weiland was not disabled.  (*Id*.)  The ALJ's decision became final on April 8, 2014 when the Appeals Council declined further review.  (*Id*.)  In the instant case, the ALJ determined he was not bound by the previous ALJ decision because Weiland "has submitted new and substantial evidence since the previous decision establishing a change in her condition." (Tr. 20.)  The ALJ did, however, clarify that he would consider Weiland's claim only for the unadjudicated period commencing January 1, 2013, the day after the previous ALJ decision.  (*Id*.)

## II.    EVIDENCE

**A.      Personal and Vocational Evidence**

Weiland was born in March 1986 and was thirty (30) years-old at the time of her administrative hearing, making her a "younger" person under social security regulations.  (Tr. 32.)  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  She has at least a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as a retail clerk.  (Tr. 32.)

**B.      Relevant Medical Evidence[3]**

**1.        Physical Impairments**

Weiland was diagnosed with Type 1 diabetes mellitus when she was sixteen years old.[4] (Tr. 438, 445.)  On August 29, 2012, she presented to endocrinologist Anant Jeet, M.D., for a follow-up diabetic visit.  (Tr. 549-552.)  Dr. Jeet found Weiland's "disease course" and symptoms were worsening.  (Tr. 549.)  He indicated the presence of diabetic complications

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the medical evidence cited in the parties' Briefs.

[4]  The Social Security Administration ("SSA") has described Type 1 diabetes mellitus ("DM") as follows:  "In Type 1 DM, previously known as juvenile-onset DM or insulin-dependent DM, the pancreas does not produce insulin due to an autoimmune destruction of the insulin-producing cells.  This results in increased blood glucose levels. The onset of Type 1 DM usually has the following symptoms: Polydipsia (increased thirst); polyphagia (increased appetite); polyuria (increased urination); unexplained weight loss; fatigue or drowsiness; and blurred vision.  Type 1 DM develops most often in children but can occur at any age.  People with Type 1 DM must take daily insulin to live. They generally check their blood glucose levels prior to each meal and at bedtime; however, more frequent checking may be necessary as prescribed by a physician (for example, DM management of young school-aged children may require more frequent blood glucose level checks).  Many children with Type 1 DM experience significant day-to-day variability in their DM, usually due to variations in activity. Depending on the child's age, this may necessitate daily, or even hourly, decision-making and intervention either by an adult or under the close supervision of an adult."  Social Security Ruling ("SSR") 14-2p, 2014 WL 2472008 at * 2 (SSA June 2, 2014).

including nephropathy and hypoglycemia.[5]  (*Id.*)  Weiland's symptoms included dizziness, headaches, mood changes, nervousness/anxiousness, sleepiness, blurred vision, fatigue, polydipsia, and polyphagia.  (*Id.*)  Weiland's treatment included insulin injections and an "intensive insulin program."  (*Id.*)  She followed a diabetic diet, exercised intermittently, and monitored her blood glucose at home three to four times per week.  (*Id.*)  Dr. Jeet noted Weiland was compliant with treatment "all of the time," and found her "blood glucose monitoring compliance is fair."  (*Id.*)  Physical examination findings were normal.  (Tr. 550.)  Weiland's glucose level, however, was high at 215.[6]  (Tr. 551.)  Dr. Jeet assessed "type 1 (juvenile type) diabetes mellitus without mention of complication, not stated as uncontrolled."  (Tr. 550.)

Weiland returned to Dr. Jeet on October 5, 2012.  (Tr. 553-556.)  She complained of fatigue, blurred vision, dizziness and headaches, polydipsia and polyphagia, and nervousness/anxiousness.  (Tr. 553.)  Dr. Jeet again noted Weiland's disease course and symptoms were worsening.  (*Id.*)  Physical examination findings were normal, but Weiland's glucose was high at 392.  (Tr. 554-555.)  Dr. Jeet diagnosed type 1diabetes mellitus without mention of complication, not stated as uncontrolled; and fatigue.  (Tr. 554.)  He increased her

---

[5] "Hypoglycemia (low blood glucose) means that a person has abnormally low levels of blood glucose (also known as 'insulin reaction').  It causes acute symptoms and signs, such as weakness, hunger, sweating, trembling, nervousness, palpitations, and difficulty with concentration. * * *  Hypoglycemia can occur when a person takes too much insulin (or a drug that increases insulin resistance), misses a meal, or exercises more than usual. * * * Episodes of hypoglycemia occur commonly in people with Type 1 DM and occur in some people with Type 2 DM. * * *  If not treated promptly, hypoglycemia can become severe, causing an inadequate supply of glucose to brain cells, which can lead to complications including seizures or loss of consciousness, altered mental status, cognitive deficits, permanent brain damage, or death." SSR 14-2p, 2014 WL 2472008 at * 4-5.

[6] Weiland's medical records indicate the normal range for glucose is between 60 and 115.  *See e.g.*, Tr. 464-465.

4

insulin dosage.  (*Id*.)

On December 7, 2012, Dr. Jeet found Weiland's diabetes and symptoms were "improving."  (Tr. 557.)  Weiland continued to complain of fatigue, blurred vision, dizziness and headaches, polydipsia and polyphagia, and nervousness/anxiousness.  (Tr. 557.)  Physical examination findings were normal, however, and her glucose level was improved at 123.  (Tr. 558-559.)  Dr. Jeet diagnosed type 1diabetes mellitus without mention of complication, not stated as uncontrolled; and diabetic nephropathy.  (Tr. 558.)  Several months later, on March 4, 2013, Weiland's glucose and hemoglobin A1c levels were high at 146 and 9.9,[7] respectively.  (Tr. 464-465.)

Weiland returned to Dr. Jeet on March 8, 2013.  (Tr. 561-564.)  She complained of fatigue, blurred vision, dizziness and headaches, polydipsia and polyphagia, and nervousness/anxiousness.  (Tr. 562.)  Dr. Jeet found Weiland's disease course and symptoms were "stable."  (Tr. 561.)  Her glucose level was 121.  (Tr. 563.)

On April 18, 2013, Weiland was admitted to the hospital for treatment of diabetic ketoacidosis.[8]  (Tr. 436-462.)  She presented with complaints of nausea, increased heart rate, and dehydration.  (Tr. 445.)  Weiland explained her insulin pen had malfunctioned and she missed

---

[7] Weiland's treatment records indicate the normal range for hemoglobin A1c is 4.2 to 5.9. (Tr. 464- 465.)

[8] "Diabetic ketoacidosis (DKA) is an acute complication of hyperglycemia and is potentially life-threatening. It is not uncommon for people with Type 1 DM to initially present with DKA. DKA occurs when there is a shortage of insulin, resulting in toxicity in the blood. DKA may result in dehydration and an altered metabolic state with potential neurological, renal, respiratory, or cardiac dysfunction(s). When not appropriately treated, DKA may lead to chronic neurocognitive changes, coma, or even death."  SSR 14-2p, 2014 WL 2472008 at * 3.

two days of insulin.  (*Id*.)  Lab testing showed ketones in Weiland's urine and a very high blood

glucose level of 593.  (Tr. 445-446, 452.)  Weiland was placed on an IV insulin drip.  (Tr. 451-

452.)

Weiland returned to Dr. Jeet on May 10, 2013.  (Tr. 565-568.)  Dr. Jeet described her

disease course and symptoms as stable, and diagnosed type 1diabetes mellitus without mention of

complication, not stated as uncontrolled; and diabetic nephropathy.[9]  (Tr. 565-566.)  Weiland's

glucose level was 154.  (Tr. 567.)

On June 12, 2013, Weiland underwent an electromyogram ("EMG") of her lower

extremities due to complaints of neuropathy.  (Tr. 434-435.)  This EMG found as follows:

> Essentially normal nerve conduction studies of the lower extremities except for low
> amplitude tracings of the common peroneal nerves and some mildly decreased
> conduction velocity in the right common peroneal nerves as seen in diabetes. These
> findings do not suggest a large fiber neuropathy.  A small fiber neuropathy may be
> due to diabetes. Other causes of neuropathies must be ruled out. There is no
> suggestion of any myopathy potentials.

(Tr. 434.)

On August 9, 2013, Weiland presented to pain management specialist Heather Scullin,

D.O.  (Tr. 690-698.)  Weiland complained of bilateral hand pain, which she described as

moderate and rated a 5 on a scale of 10.  (Tr. 690.)  She also reported chronic neck pain, which

occurred "constantly" and had been "gradually worsening."  (Tr. 691.)  Weiland rated her neck

pain a 7 on a scale of 10, and indicated it was aggravated by bending and stress.  (*Id*.)  Dr. Scullin

---

[9]  "Diabetic nephropathy is damage to the kidneys caused by chronic hyperglycemia.
When the kidneys are damaged, protein leaks out of the kidneys into the urine. Damaged
kidneys can no longer remove waste and extra fluids from the bloodstream.  Diabetic
nephropathy is a leading cause of end-stage renal disease.  Careful management of blood
glucose levels, together with the reduction of a co-morbid condition such as high blood
pressure, may slow the damage." SSR 14-2p, 2014 WL 2472008 at * 4.

also noted mental health problems, including "bizarre behavior, negative symptoms, and somatic symptoms." (*Id*.) Somatic symptoms included fatigue, headaches, and myalgias. (*Id.*) Finally, Weiland complained of focal sensory loss and weakness, which had been "gradually worsening." (*Id.*)

On examination, Dr. Scullin found Weiland did not have a "sickly appearance" and did not appear ill. (Tr. 694.) Her neck was supple and had normal range of motion, with no edema or thyromegaly. (*Id*.) Dr. Scullin noted decreased range of motion, tenderness, pain and spasm in Weiland's cervical and lumbar backs. (*Id*.) In addition, she found decreased range of motion, tenderness, decreased sensation, and decreased strength in Weiland's bilateral hands. (Tr. 695.) On neurological examination, Dr. Scullin found normal strength, muscle tone, coordination and gait, with no atrophy or tremor. (Tr. 696.) Abnormal achilles reflexes were present on the left and right. (*Id*.) On psychiatric examination, Dr. Scullin noted normal behavior, judgment, speech, cognition, memory, and thought content, but found blunted affect, depressed mood, and poor eye contact. (*Id*.)

Dr. Scullin diagnosed (1) bilateral hand pain, active, severe; (2) numbness and tingling in hands, active in her ring and 5th digit bilaterally; (3) carpal tunnel syndrome, active, pending EMG; (4) depression, active, severe; (5) history of self-mutilation; (6) neuropathy; (7) type 1 diabetes mellitus without mention of complication, not stated as uncontrolled, active; (8) neck pain, active; and (9) whiplash injury, chronic, active. (Tr. 696-697.) She prescribed Diclofenac; advised Weiland to exercise three times per week; and ordered an EMG and lab work. (Tr. 697-698.)

Several weeks later, on August 17, 2013, Weiland returned to Dr. Jeet. (Tr. 699-701.) He

found Weiland's diabetes and symptoms were worsening.  (Tr. 699.)  Complications again included nephropathy and hypoglycemia.  (*Id*.)  Weiland complained of fatigue, blurred vision, polydipsia, polyphagia, dizziness, headaches, and nervousness/anxiousness.  (Tr. 699-700.)  Physical examination was normal; however, Weiland's A1c level was high at 11.4.  (Tr. 700.)

Weiland returned to Dr. Scullin on September 23, 2013.  (Tr. 702-710.)  She complained of hand pain, weakness, numbness and tingling.  (Tr. 702.)  Weiland also reported fatigue, nosebleeds, neck pain and stiffness, myalgias, dizziness, headaches, sleep disturbance, decreased concentration, insomnia, and nervousness/anxiousness.  (*Id.*)  Examination of Weiland's cervical, thoracic and lumbar backs was normal; however, Dr. Scullin noted decreased sensation in Weiland's bilateral hands.  (Tr. 705-706.)  She diagnosed (1) history of self-mutilation, active; (2) neuropathy, active; (3) neck pain, active; (4) ulnar nerve entrapment at elbow, active; (5) carpal tunnel syndrome, active; (6) bipolar 1 disorder; (7) epicondylitis, lateral (tennis elbow); (8) whiplash injury, chronic; and (9) type 1 diabetes mellitus without mention of complication, not stated as uncontrolled.  (Tr. 707-708.)  She ordered wrist splints and referred Weiland to surgery.[10]  (Tr. 707.)

On November 11, 2013, Weiland returned to Dr. Jeet.  (Tr. 748-752.)  He noted Weiland's disease course and symptoms were improving.  (Tr. 748.)  Physical examination findings were normal.  (Tr. 749.)  However, Weiland's A1c level was high at 10.1, and she complained of fatigue, blurred vision, dizziness, headaches, polydipsia, polyphagia, and

---

[10] It is not entirely clear but it appears Dr. Sculling reviewed the results of an EMG of Weiland's upper extremities as showing carpal tunnel syndrome and "bilateral ulnar slowing." (Tr. 709.)  The parties do not, however, direct this Court's attention to the actual EMG study of Weiland's upper extremities.

nervousness/anxiousness.  (*Id.*)

Shortly thereafter, on November 21, 2013, Weiland was hospitalized for treatment of diabetic ketoacidosis and dehydration.  (Tr. 422-426.)  She presented to the ER with complaints of nausea, headache, and sore throat.  (Tr. 424.)  Her blood sugar had been high at home, "more than 600."  (*Id.*)  Lab work performed at the hospital revealed a glucose level of 528.  (*Id.*)  Weiland was started on IV fluids and insulin.  (*Id.*)  She was diagnosed with uncontrolled diabetes type 1, early diabetic ketoacidosis, and dehydration; and discharged on November 22, 2013.  (Tr. 424-425, 422.)

On January 27, 2014, Dr. Jeet completed a "Health Care Provider Certification Form for non-Job Protected Family and Medical Leave."  (Tr. 466-469.)  Dr. Jeet concluded Weiland would need to miss work on an intermittent basis due to her type 1 diabetes.  (Tr. 467.)  Specifically, he concluded as follows: "[Weiland] will need 1 day off every 2-3 months to come in for office visits and an additional 2 days a month if she has blood sugar problems."  (Tr. 468.)  Dr. Jeet further found Weiland could work eight hours each day but she "will need breaks to check blood sugars or to have snacks."  (*Id.*)  He concluded it was medically necessary for Weiland to miss work as set forth above.  (*Id.*)

Weiland returned to Dr. Jeet for a diabetic follow up visit on February 10, 2014.  (Tr. 574-578.)  He found her condition and symptoms were worsening.  (Tr. 574.)  Weiland's glucose and A1c levels were both high, at 395 and 10.9, respectively.  (Tr. 575, 577.)  Dr. Jeet diagnosed "type 1 (juvenile type) diabetes mellitus without mention of complication, uncontrolled."  (Tr. 576.)

Weiland returned to Dr. Jeet in May, July, and October 2014.  (Tr. 579-584, 585-589, 766-

9

770.)  In May 2014, Weiland's diabetes and symptoms were "stable," although both her glucose and A1c levels were high (at 189 and 10.8, respectively).  (Tr. 579-584.)  In July and October 2014, Dr. Jeet determined Weiland's diabetes and symptoms were "worsening."  (Tr. 585-589, 766-770.)  Although Weiland was "compliant with treatment all of the time," he diagnosed her type 1 diabetes as uncontrolled during all three visits.  (Tr. 582, 587, 769.)  Dr. Jeet also assessed diabetic nephropathy and gastroenteritis.  (*Id.*)

On January 29, 2015, Dr. Jeet again concluded Weiland's diabetes and symptoms were "worsening."  (Tr. 771-775.) Weiland complained of fatigue, polyuria, dizziness, and weakness. (Tr. 772.)  She was nervous and anxious, and presented with a dysphoric mood.  (*Id.*)  Physical examination findings were normal.  (*Id.*)  However, Weiland's A1c level was very high at 12.4, and her glucose was elevated at 151.  (Tr. 772, 774.)  Dr. Jeet diagnosed uncontrolled type 1 diabetes mellitus.  (Tr. 773.)

Weiland returned to Dr. Jeet on April 30, 2015.  (Tr. 886-890.)  At that time, Dr. Jeet found Weiland's disease course and symptoms were improving.  (Tr. 886.)  She was compliant with treatment "most of the time."  (*Id.*)  Physical examination findings were normal.  (*Id.*) However, Weiland's glucose and A1c levels were both high at 229 and 9.9, respectively.  (Tr. 887, 889.)  Dr. Jeet again diagnosed uncontrolled type 1 diabetes mellitus.  (Tr. 888.)

The record reflects Weiland was in a motor vehicle accident on June 8, 2015.  (Tr. 852-853, 914.)  She presented to the ER with complaints of neck, back and knee pain.  (*Id.*)  The following day, Weiland presented to Ronald Carissimi, M.D.  (Tr. 913-917.)  She complained of continued back and neck pain, as well as a slight headache.  (Tr. 914.)  On examination, Dr. Carissimi noted slight tenderness in Weiland's neck, thoracic spine, and right knee, with normal

10

range of motion, 5/5 upper extremity strength, and no focal deficits.  (Tr. 915.)  He diagnosed neck pain, mid-back pain, and knee contusion; and prescribed Naprosyn.  (*Id.*)

On June 10, 2015, Weiland returned to Dr. Jeet.  (Tr. 882-885.)  He found Weiland's disease course and symptoms were worsening.  (Tr. 883.)  Weiland complained of fatigue, myalgias, dizziness, and nervousness/anxiousness.  (*Id.*)  Dr. Jeet assessed uncontrolled type 1 diabetes mellitus.  (Tr. 884.)

On that same date, Weiland began treatment with chiropractor Brian Studer, D.C.  (Tr. 873.)  She complained of pain on the "whole left side" of her body, including in her neck, back, arm, shoulder, elbow, wrist, hand, hip, leg, knee, and ankle/foot.  (*Id.*)  She described the pain as constant and moderate in intensity.  (*Id.*)  Weiland also complained of headache, blurry vision, loss of balance, poor memory/loss, difficulty sleeping, language difficulty, reduced mental stamina, hand tremors, nausea, numbness, irritability, chest pain, fatigue, extremity weakness, grip strength weakness and anxiety.  (Tr. 876.)  On examination, Dr. Studer noted pain, spasms, and fixations in Weiland's cervical, thoracic, and lumbar spines.  (Tr. 874.)  He also found decreased range of motion in her cervical spine and thoracic spine.  (*Id.*)  Dr Studer diagnosed (1) segmental dysfunction; (2) cervical strain; (3) thoracic strain; (4) left shoulder strain; (5) left elbow contusion; (6) left wrist strain; (7) anxiety; (8) left elbow strain; (9) lumbosacral strain; (10) left ankle strain; (11) headache; (12) muscle spasm; (13) anterior rib strain; (14) dizziness; and (15) blurred vision.  (Tr. 869.)

On June 16, 2015, Weiland presented to her primary care physician Jennifer Calabrese, M.D.  (Tr. 852-861.)  Physical examination findings were normal with the exception of mild trapezius pain bilaterally.  (Tr. 855-856.)  Dr. Calabrese diagnosed cervical strain, acute;

11

uncontrolled type 1 diabetes mellitus; neuropathy; bipolar 1 disorder; and depression.  (Tr. 856.)
She prescribed Flexeril and Mobic, and indicated Weiland needed physical therapy.  (Tr. 856-857.)

Weiland returned to Dr. Calabrese on July 24, 2015.  (Tr. 846-851.)  She complained of
memory loss following her motor vehicle accident, particularly with regard to "simple short term
memory."  (Tr. 846.)  Physical examination findings were normal.  (Tr. 849-850.)  Dr. Calabrese
ordered a CT scan of Weiland's head with contrast.  (Tr. 850.)

Meanwhile, Weiland presented regularly to Dr. Studer for chiropractic treatment between
June and August 2015.  (Tr. 863-868.)  On July 15, 2015, Weiland reported her pain had
improved by 65% since the motor vehicle accident.  (Tr. 871.)  She continued to complain of neck
and back pain, but stated she no longer experienced chest/anterior rib pain or blurred vision.  (*Id.*)
Weiland also indicated that, while still present, her headaches and dizziness had decreased.  (*Id*.)
Later that month, Weiland indicated she was "approximately 70 to 75% better overall."  (Tr. 864.)

On August 21, 2015, Weiland returned to Dr. Calabrese for follow-up regarding her post-accident memory loss.  (Tr. 945-949.)  Physical examination findings were normal.  (Tr. 948.) Dr.
Calabrese referred Weiland to neurology for evaluation of her memory issues, noting "if memory
issues worsen [Weiland] may need to stop" driving.  (Tr. 949.)

Weiland presented to Dr. Jeet on September 11, 2015.  (Tr. 1026-1030.)  He found
Weiland's disease course and symptoms were improving.  (Tr. 1027.)  Weiland complained of
fatigue, polydipsia, polyuria, dizziness, and nervousness/anxiousness.  (Tr. 1028.)  Her glucose
level was high, at 134.  (Tr. 1029.)  Dr. Jeet assessed uncontrolled type 1 diabetes mellitus.  (*Id*.)

Weiland continued to present to Dr. Studer between October 2015 and February 2016.

12

(Tr. 926-930.)  On October 7, 2015, Weiland rated her neck pain a 3 on a scale of 10; and her mid-back pain a 4 on a scale of 10.  (Tr. 930.)  She stated her lower back pain was mild and intermittent.  (*Id*.)  The following month, Weiland reported her mid-back and neck pain had decreased.  (Tr. 928.)  Dr. Studer noted she was mildly improved.  (*Id*.)  Treatment notes indicate Weiland's neck and back pain were exacerbated in December 2015, but later improved somewhat. (Tr. 926-927.)

Meanwhile, on November 30, 2015, Weiland returned to Dr. Jeet.  (Tr. 1021-1025.)  He found her disease course "has been fluctuating" and her symptoms were "worsening."  (Tr. 1021.) Physical examination findings were normal.  (Tr. 1023.)  Weiland's glucose and A1c levels were both high, at 181 and 10.6, respectively.  (Tr. 1024.)

On that same date, Weiland presented to Dr. Calabrese.  (Tr. 938-944.)  Physical examination findings were normal.  (Tr. 941-942.)  Noting an MRI of Weiland's brain was normal, Dr. Calabrese advised counseling "since PTSD from [motor vehicle accident] possibly the culprit per neurology."  (Tr. 942.)

On February 15, 2016, Dr. Studer completed a Physical Medical Source Statement.  (Tr. 922-925.)  He identified diagnoses of lumbago, cervicalgia, and thoracic pain; and indicated Weiland's prognosis was "guarded."  (Tr. 922.)  Dr. Studer listed Weiland's symptoms as neck pain, mid/upper/lower back pain, headaches, anxiety, dizziness, and left shoulder pain.  (*Id*.)  He offered the following opinions regarding Weiland's physical functional limitations:

- She could walk 1 to 2 city blocks without rest or severe pain.

- She could sit for 2 hours at one time, and for at least 6 hours total in an 8 hour workday.

- She could stand for 2 hours at one time, and stand/walk for at least 6

13

hours total in an 8 hour workday.

- She would need a job that permits shifting positions at will from sitting, standing, or walking.

- She would need periods of walking around during an 8 hour workday. Specifically, she would need to walk every 90 minutes for 15 minutes each time.

- In addition to normal breaks every two hours, she would need unscheduled breaks every two to three hours for 15 minutes each time due to her muscle weakness and pain.

- She could frequently lift and carry 10 pounds; occasionally lift and carry 20 pounds; and rarely lift and carry 50 pounds.

- She could frequently twist; occasionally stoop, climb stairs, and climb ladders; and rarely crouch/squat.

- She had no significant limitations with reaching, handling or fingering.

- She would likely be off-task 25% or more of a typical workday.

- She is capable of tolerating moderate work stress.

- Her impairments are likely to produce good days and bad days.

- She would likely be absent from work as a result of her impairments or treatment about two days per month.

(Tr. 922-925.)

Weiland returned to Dr. Jeet on February 29, 2016.  (Tr. 1016-1020.)  He found her disease course and symptoms were worsening.  (Tr. 1016.)  Weiland complained of fatigue, dizziness, and nervousness/anxiousness.  (Tr. 1017.)  Physical examination findings were normal. (Tr. 1017-1018.)  Dr. Jeet assessed uncontrolled type 1 diabetes mellitus, and diabetic nephropathy.  (Tr. 1019.)

On that same date, Weiland presented to Dr. Calabrese.  (Tr. 987-993.)  Her glucose and

A1c levels were both high at 153 and 11.9, respectively.  (Tr. 989, 991.)  Dr. Calabreses "again had a lengthy discussion with [Weiland] about the risks of poorly controlled diabetes," including vascular complications, blindness, and death.  (Tr. 992.)

During that visit, Dr. Calabrese completed a Medical Source Statement regarding Weiland's physical functional limitations.  (Tr. 982-985.)  She indicated she had treated Weiland for 10 years and characterized her prognosis as "fair."  (Tr. 982.)  Diagnoses included diabetes type 1, depression, anxiety, and carpal tunnel syndrome.  (*Id.*)  Dr. Calabrese listed Weiland's symptoms as headache, fatigue, mood swings, forgetfullness, and pain in her neck, lower back, and "left side of body."  (*Id.*)  She indicated Weiland's condition was "worsened by unpredictable sugar fluctuations and strain," and noted in particular that Weiland experienced drowsiness as a result of her sugar fluctuations.  (*Id.*)  Dr. Calabrese offered the following opinions regarding Weiland's physical functional limitations:

- She could walk ½ of a city block without rest or severe pain.

- She could sit for 45 minutes at one time, and for a total of less than 2 hours in an 8 hour workday.

- She could stand for 15 minutes at one time, and stand/walk for a total of less than 2 hours in an 8 hour workday.

- She would need a job that permits shifting positions at will from sitting, standing, or walking.

- She would need periods of walking around during an 8 hour workday. Specifically, she would need to walk every 30 minutes for 5 minutes each time.

- In addition to normal breaks every two hours, she would need unscheduled breaks every one to two hours for 15 minutes each time due to her muscle weakness and pain.

- She could rarely lift and carry 10 pounds, and never carry 20 or 50

15

pounds.

- She could occasionally twist, stoop, and crouch/squat; rarely climb stairs, and never climb ladders.

- She had no significant limitations with reaching, handling or fingering.

- She would likely be off-task 15% or more of a typical workday.

- She is capable of tolerating low work stress.

- Her impairments are likely to produce good days and bad days.

- She would likely be absent from work as a result of her impairments or treatment about three days per month.

(Tr. 982-985.)  In sum, Dr. Calabrese opined Weiland could work "15-20/ week max given diagnoses."  (Tr. 985.)

### 2. Mental Impairments

On September 7, 2012, Weiland presented for a Psychiatric Evaluation with Felicia Fior-Nossek, MSN, APRN-BC.  (Tr. 404-407.)  She reported a history of alcohol abuse and cutting herself; and complained of anxiety, panic, depression, fatigue, and mood swings.  (Tr. 404.) Weiland indicated she had received previous psychiatric treatment at the Nord Center, and had been prescribed Zoloft, Cymbalta, Viibrid, and Trazadone.  (*Id.*)  On mental status examination, Weiland was cooperative and alert but disheveled.  (Tr. 405-406.)  She had a blunted affect and her mood was depressed, angry, irritable, and anxious.  (*Id.*)  Weiland's speech and memory were normal, but Ms. Fior-Nossek estimated her intelligence as below average.  (*Id.*)  She found Weiland had poor judgment and insight.  (*Id.*)

Ms. Fior-Nossek noted additional symptoms including panic, mood swings, "easily angered- throws and hits stuff," crying spells, racing thoughts, repetitive, and poor eye contact.

16

(Tr. 405-406.)  She diagnosed major depressive disorder, "rule out bipolar disorder," and dyslexia.  (Tr. 406.)  Ms. Fior-Nossek assessed a Global Assessment of Functioning ("GAF") of 58,[11] indicating moderate symptoms.  (Tr. 407.)  She prescribed Viibrid and Seroquel.  (*Id.*)

The record reflects Weiland attended ten counseling sessions between September 2012 and October 2013.  (Tr. 408-417.)  During this time period, Weiland's GAF scores ranged between 60 and 85, indicating mild to moderate symptoms.  (*Id.*)  Her prognosis was most often rated as good, and occasionally as fair.  (*Id.*)  In October 2012, Weiland complained of depression and difficulty sleeping. (Tr. 415-416.)  The following month, she reported feeling "a little better" and "sleeping better," although her counselor noted some hypomania.  (Tr. 414.)  In January 2013, Weiland reported crying at night and struggling.  (Tr. 413.)  Weiland's Viibrid dosage was increased.  (*Id.*)  In March 2013, however, Weiland was "doing better," less depressed, and doing well in school.  (Tr. 412.)  Her mood was "pretty good" in May 2013 and her GAF was assessed at 80.  (Tr. 411.)  In June 2013, Weiland complained of "extreme fatigue," although she indicated she was not depressed.  (Tr. 410.)  Finally, in October 2013, Weiland was hyperverbal with poor eye contact.  (Tr. 408.)  She complained of increased appetite, binge eating, and some depression. (*Id.*)

---

[11] The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

C.      **State Agency Reports**

1.      **Physical Impairments**

On January 13, 2015, state agency physician Anne Prosperi, D.O., reviewed Weiland's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 154-157.)  Dr. Prosperi determined Weiland could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday.  (*Id.*)  She found Weiland could frequently climb ramps and stairs, stoop, kneel, crouch, and crawl; but never climb ladders, ropes, or scaffolds.  (*Id.*)  Dr. Prosperi further opined Weiland was limited to frequent bilateral hand controls and frequent bilateral handling, fingering, and feeling.  (*Id.*)  Finally, she determined Weiland should avoid all exposure to hazards such as machinery and heights, due to her peripheral neuropathy.  (*Id.*)

On May 19, 2015, state agency physician Gary Hinzman, M.D., reviewed Weiland's medical records and completed a Physical RFC Assessment.  (Tr. 187-191.)  He offered the same limitations as Dr. Prosperi.  (*Id.*)

2.      **Mental Impairments**

On January 21, 2015, state agency psychologist Bruce Goldsmith, Ph.D., reviewed Weiland's medical records and completed a Psychiatric Review Technique ("PRT") and Mental RFC Assessment.  (Tr. 153, 157.)  Dr. Goldsmith found Weiland had mild limitations in her activities of daily living, and moderate limitations in both social functioning and concentration, persistence, or pace.  (Tr. 153.)  With regard to the Mental RFC Assessment, Dr. Goldsmith adopted the Mental RFC assessed by the previous ALJ in his December 2012 decision as follows:

> Ms. Weiland has the residual functional capacity to understand, remember, and
> carry out 3 to 4 step tasks, is unable to work in a fast paced production

18

environment such as an assembly line or an environment that involves high production quotas and she is limited to superficial interaction with co-workers and the public meaning that contacts are of short duration and for a specified purpose.

(Tr. 157.)

On May 22, 2015, state agency psychiatrist Ermias Seleshi, M.D., reviewed Weiland's medical records and completed a PRT and Mental RFC Assessment.  (Tr. 186-187, 191.)  Dr. Seleshi reached the same conclusions as Dr. Goldsmith.  (*Id.*)

**D.      Hearing Testimony**

During the April 5, 2016 hearing, Weiland testified to the following:

- She lives with her parents.  (Tr. 49.)  She has dyslexia and was in special education classes throughout high school.  (Tr. 51.)  She graduated from high school and is a licensed cosmetologist.  (Tr. 51-53.)  She has a driver's license and drives several times per week.  (Tr. 49.)

- She has worked as a cosmetologist in a small salon.  (Tr. 53.) She has also worked in retail, at Kmart, Dillard's and Vitamin World.  (Tr. 53, 55-56.)  She currently works part time at Target.  (Tr. 53-54.)  She works three days per week for a total of 15 to 20 hours.  (*Id.*)  She has turned down extra days and hours because, after working a full day, she experiences "extreme pain" and fatigue. (*Id.*)

- She was diagnosed with diabetes when she was 16.  (Tr. 59.)  She is insulin-dependent.  (*Id.*)  Her diabetes is difficult to control.  (*Id.*) When she gets very busy, she sometimes forgets to check her blood sugar and/or take her insulin.  (Tr. 60-61.)  She also has "memory issues" that affect her ability to remember to take her medication.  (*Id.*)

- She experiences spells when her blood sugar drops too low.  (Tr. 68-69.)  Her speech becomes slurred, she staggers, and she feels she is "in a state of confusion."  (Tr. 64.)  Her spells are triggered by stress and when she is very active at work.  (Tr. 69.)  She has one or two spells during an 8 hour work day. (*Id.*)  When she has a spell while working at Target, she is generally permitted to take a brief break.  (Tr. 68.)

- As a result of her diabetes, she suffers from neuropathy in her hands and fingers. (Tr. 62-63.)  Her fingers go "absolutely numb" and it can take up to 20 minutes to regain feeling.  (*Id.*)  She also experiences numbness in her legs and toes.  (Tr.

19

72.)

- She was in a motor vehicle accident in June 2015.  (Tr. 50.)  She now has extreme anxiety about driving, resulting in "extreme headaches" and nausea.  (Tr. 50-51.)  She also experiences pain and muscle spasms in her knees, legs, and back as a result of the accident.  (Tr. 54.)  She experiences muscle spasms once or twice per week.  (Tr. 70.)

- She experiences headaches "quite frequently."  (Tr. 71.)  Her headaches generally last a whole day.  (*Id*.)  She cannot perform her job when she has a headache.  (*Id*.)

- She suffers from carpal tunnel syndrome.  (Tr. 62.)  She has considered surgery but cannot afford it and does not want to miss work.  (*Id*.)  She has been prescribed braces but "they are not comfortable."  (*Id*.)

- She cannot lift ten pounds due to pain in her shoulders, back and legs.  (Tr. 65-66.)  She cannot squat or bend.  (Tr. 66-67.)  She can walk approximately ½ mile.  (Tr. 66.)  She pushes/pulls a pallet jack on rollers at Target.  (Tr. 75.)   The most amount of weight she has pushed/pulled on a pallet is 50 pounds.  (*Id*.)

- She helps with some chores at home.  (Tr. 66-67.)  She can sweep, dust, mop, and vacuum as long as she does not have to bend.  (*Id*.)  She cannot carry a laundry basket.  (*Id*.)  She can go grocery shopping but only gets one bag of groceries at a time.  (Tr. 68.)

The VE testified Weiland had past work as a retail clerk (light, semiskilled, SVP 3).  (Tr.

77.)  The ALJ then posed the following hypothetical question:

I want you to assume a hypothetical individual with Ms. Weiland's vocational profile, who is limited to the performance of light work[12] as defined under the

---

[12] "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 CFR § 404.1567(b).  Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

regulations.  Let's limit her to frequent push/pulling of hand controls bilaterally. She should never climb ladders, ropes, or scaffolds.  She can frequently climb ramps or stairs, stoop, kneel, crouch and crawl.  She is limited to frequent, bilateral handling, fingering and feeling, and she should avoid all exposure to hazards such as dangerous machinery and unprotected heights. . . . . She's able to understand, remember and carry out three to four-step tasks but is unable to work in a fast-paced production environment, such as an assembly line or an environment that involves high production quotas and she is limited to superficial interaction with coworkers and the public, meaning that contacts are of short duration and for a specified purpose.

(Tr. 77-78.)

The VE testified the hypothetical individual would not be able to perform Weiland's past work as a retail clerk but would be able to perform other representative jobs in the economy, such as office cleaner (light, unskilled, SVP 2); marker (light, unskilled, SVP 2) and office clerk helper (light, unskilled, SVP 2).  (Tr. 78-79.)

The ALJ then asked a second hypothetical that was the same as the first but limited to the sedentary exertional level.[13]  (Tr. 79.)  The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as table sorter (sedentary, unskilled, SVP 2), office worker (sedentary, unskilled, SVP 2), and circuit board inspector (sedentary, unskilled, SVP 2).  (Tr. 79.)

---

[13]"Sedentary work" is defined as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 CFR § 404.1567(a).  SSR 83–10 provides that "Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8–hour workday, and sitting should generally total approximately 6 hours of an 8–hour workday."  SSR 83–10, 1983 WL 31251 (1983).

The ALJ then asked whether the VE's testimony would change, under either of the two above hypotheticals, if the hypothetical individual was limited to simple, routine tasks.  (Tr. 80.) The VE testified his answers would not change with this additional limitation.  (*Id*.)

Weiland's counsel then asked as follows:

Q:     Based on the opinions of her treating physician, at Exhibit 22E, would there be– would any of these jobs be available to a person who would be off task 15% or more of the workday?

A:     For these jobs, I think you would find that 15%, which is about nine minutes out of every hour, that that would likely eliminate those jobs.

Q:     Okay.  And, let's see, if she were to need additional breaks every one to two hours, for about 15 minutes, due to her symptoms, would there be work available?

A:     No. That would be excessive.

Q:     Okay.  And if she were to miss work approximately two days per month, would be there work available?

A:     Two days per month is acceptable by some employers; not others.  In a 2012 peer reviewed, empirical publication that I published in, asking over 1,000 employers that question, about primarily unskilled work at the sedentary and light level, 34% of them said, you know, they would terminate after two days per month and 48% said they would terminate after three days per month.

Q:     Okay.  So, at three days absenteeism, there would be no work?

A:      After three days, so four days or more.

Q:     Okay. And, just to make sure I cover all my bases, would the need to change positions and walk around every 30 minutes, for approximately 5 minutes, would there be work available?

A:     Walking around -- that would be about 10 minutes out of every hour so -- at sedentary jobs, if they have to get up and leave the work station, that would eliminate those jobs as being, you know, more than 10% off task or I should say 15% off task and the light jobs, there again, if you had to actually leave what you were doing for 10 minutes out of every hour, then

that would be pushing it and would -- I won't say rule out all work but it
would certainly rule out a vast majority of all work.

(Tr. 80-81.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the
time of disability and must prove an inability to engage "in substantial gainful activity by reason
of any medically determinable physical or mental impairment," or combination of impairments,
that can be expected to "result in death or which has lasted or can be expected to last for a
continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when
she became disabled; and (3) she filed while she was disabled or within twelve months of the date
the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905;
*Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a
claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and
416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of
a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of
Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir.
1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial
gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and*
416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order
to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe

23

impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Weiland was insured on her alleged amended disability onset date, January 1, 2013, and remained insured through September 30, 2017, her date last insured ("DLI.") (Tr. 20.) Therefore, in order to be entitled to POD and DIB, Weiland must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2017.

2.    The claimant has not engaged in substantial gainful activity since January 1, 2013, the amended alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

24

3.     The claimant has the following severe impairments: diabetes mellitus, Type 1; carpal tunnel syndrome; peripheral neuropathy; obesity; mood disorder; and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: she is limited to frequent push/pulling of hand controls bilaterally.  She should never climb ladders, ropes or scaffolds.  She can frequently climb ramps or stairs, stoop, kneel, crouch, and crawl.  She is limited to frequent bilateral handling, fingering, and feeling.  She should avoid all exposure to hazards, such as dangerous machinery and unprotected heights.  She is further able to understand, remember, and carry out 3 to 4 step tasks.  She is unable to work in a fast-paced production environment such as an assembly line or an environment that involves high production quotas.  She is limited to superficial interaction with coworkers and the public, meaning that contacts are of short duration and for a specified purpose.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on March ** 1986 and was 26 years old, which is defined as a younger individual age 18 -49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2013 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-34.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy*, 594 F.3d at 512; *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the

conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F.Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI.  ANALYSIS

***Treating Physicians Drs. Calabrese and Jeet***

Weiland argues remand is required because the ALJ failed to articulate "good reasons" for rejecting the opinions of treating physicians Drs. Calabrese and Jeet.  (Doc. No. 14 at 19-22.)  With regard to Dr. Calabrese's opinion, Weiland asserts the ALJ failed to articulate any specific reasons for rejecting this opinion, relying instead on "mere conclusions" and broad findings without citation to any particular medical evidence.  (*Id.*)  She further maintains the ALJ failed to acknowledge Dr. Calabrese's opinion was consistent in many respects with the opinions of both Dr. Jeet and Dr. Studer, as well as with Weiland's hearing testimony.  (*Id.*)  With regard to Dr. Jeet's opinion, Weiland argues the ALJ's reason for rejecting portions of this opinion is similarly conclusory and not supported by substantial evidence.

The Commissioner argues the ALJ properly evaluated the opinions of both Drs. Calabrese and Jeet.  (Doc. No. 15 at 22-26.)  She maintains the ALJ "reasonably assigned limited weight to the opinion [of Dr. Calabrese] because the preponderance of the evidence supported a light exertional level" and "there was insufficient evidence in the record that Plaintiff was only able to work a maximum of 15 to 20 hours per week or miss about three days of work each month."  (*Id.* at 23.)  With regard to Dr. Jeet's opinion, the Commissioner maintains the ALJ "reasonably found that [this] opinion was consistent with and adequately accommodated by the RFC, and that further limitations were not supported by the record."  (*Id.*)  Finally, the Commissioner argues the ALJ's evaluation of these opinions should be viewed in the context of the decision as a whole, including the ALJ's discussion of "Plaintiff's normal examinations, her routine and conservative treatment, her improvement with treatment, her failure to follow the

28

recommended treatment plan, her daily activities, her part-time work, and the medical opinions of the State agency medical consultants." (*Id*. at 24.)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)). Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight." *Id*. "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id*. § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id*. § 404.1502, 404.1527(c)(2)." *Id*. In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96–6p, 1996 WL 374180 at *2 (SSA July 2, 1996).[14]

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart,* 710 F.3d at

---

[14] SSR 96-6p has been rescinded and replaced by SSR 17-2p, effective March 27, 2017. *See* Soc. Sec. Rul. No. 17-2p, 2017 WL 3928306 at *1 (Soc. Sec. Admin. Mar. 27, 2017).

376; 20 C.F.R. § 404.1527(c)(2).[15]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 SSR LEXIS 9 at *9).[16] Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[17]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of Soc. Sec.*, 486

---

[15] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

[16] SSR 96-2p has been rescinded.  This recession is effective for claims filed on or after March 27, 2017.  SSR 96-2p, 2017 WL 3928298 at *1.

[17] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

F.3d at 242 (quoting SSR 96-2p, 1996 SSR LEXIS 9 at * 5).  *See also Gayheart*, 710 F.3d at 376.

The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s]

claimants understand the disposition of their cases,' particularly where a claimant knows that his

physician has deemed him disabled and therefore 'might be bewildered when told by an

administrative bureaucracy that she is not, unless some reason for the agency's decision is

supplied.'"  *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

Second, the explanation "ensures that the ALJ applies the treating physician rule and permits

meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.

Because of the significance of this requirement, the Sixth Circuit has held that the failure to

articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of

substantial evidence, even where the conclusion of the ALJ may be justified based upon the

record."  *Rogers*, 486 F.3d at 243.[18]

Nevertheless, the opinion of a treating physician must be based on sufficient medical

data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d

431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581

F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a

claimant is disabled, but may reject such determinations when good reasons are identified for not

accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of*

---

[18] "On the other hand, opinions from nontreating and nonexamining sources are never
assessed for 'controlling weight.'  The Commissioner instead weighs these opinions
based on the examining relationship (or lack thereof), specialization, consistency, and
supportability, but only if a treating-source opinion is not deemed controlling.  20 C.F.R.
§ 404.1527(c).  Other factors 'which tend to support or contradict the opinion' may be
considered in assessing any type of medical opinion.  *Id.* § 404.1527(c)(6)."  *Gayheart*,
710 F.3d at 376.

*Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Here, the ALJ determined, at step two, that Weiland suffered from the severe impairments of diabetes mellitus, Type 1; carpal tunnel syndrome; peripheral neuropathy; obesity; mood disorder; and anxiety disorder. (Tr. 23.) After finding Weiland's impairments did not meet or equal a Listing at step three, the ALJ proceeded to discuss the medical and opinion evidence regarding Weiland's physical impairments at step four. (Tr. 23-32.) The ALJ evaluated the opinions of Dr. Jeet and Dr. Calabrese as follows:

> As for the opinion evidence, Dr. Jeet completed a Health Care Provider Certification Form for Non-Job Protected Family and Medical Leave on January 27, 2014 (Exhibit C3F). Dr. Jeet opined that the claimant was unable to perform her job function due to her diabetes mellitus. She would need 1 day off every 2 to 3 months for office visits, and 2 additional days per month if she has blood sugar problems. She would require additional breaks to check blood sugars or to have snacks. The undersigned assigned considerable weight to this opinion to the extent of the above residual functional capacity. The additional days off and office visits could be arranged off work time. There is insufficient evidence in the record that the claimant was only able to work a maximum of 20 hours per week.
>
> * * *
>
> Dr. Calabrese completed a Physical Medical Source Statement on February 29,

32

2016. (Exhibit C22F). Dr. Calabrese treated the claimant for ten years for diabetes mellitus, type 1, with complications. Symptoms include headaches, fatigue, mood swings, forgetfulness, and pain in her neck, lower back, and left side of her body. Her symptoms are worsened by unpredictable sugar fluctuations and strain. Side effects from medication include dizziness. Dr. Calabrese opined the claimant could sit, stand or walk less than two hours in an eight-hour workday.  She would need to shift positions at will from sitting, standing or walking. She would need to be able to walk around. She would need additional breaks due to muscle weakness or for pain/paresthesias, numbness. She could rarely lift or carry ten pounds.  She could occasionally twist, stoop, bend, crouch or squat. She could rarely climb stairs and never climb ladders.  She would be off-task 15% of the time and she was capable of performing low stress work. Due to her impairments or treatments, she would be absent about three days per month.  Because of her diagnoses, she [c]ould work 15-20 hours a week maximum.  The undersigned assigned limited weight to this opinion because the preponderance of the evidence supports a light exertional level. There is insufficient evidence in the record that the claimant was only able to work a maximum of 15-20 hours per week, or miss work about three days per month.  The record documents the claimant is currently working part-time.  Further, the undersigned notes that Dr. Calabrese indicated that the claimant had no significant limitations with reaching, handling or fingering.

(Tr. 30-31.)  The ALJ included the following physical limitations in the RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except:  she is limited to frequent push/pulling of hand controls bilaterally. She could never climb ladders, ropes, or scaffolds.  She can frequently climb ramps or stairs, stoop, kneel, crouch and crawl.  She is limited to frequent bilateral handling, fingering, and feeling. She should avoid all exposure to hazards, such as dangerous machinery and unprotected heights.

(Tr. 25.)  As noted *supra*, light work is defined as involving lifting and carrying no more than 20 pounds ocasionally and 10 pounds frequently; and standing/walking for a total, off or on, of about six hours in an eight hour workday.  *See* 20 CFR 404.1567(b); SSR 83-10, 1983 WL 31251 (1983).

It is undisputed Dr. Jeet and Dr. Calabrese were Weiland's treating physicians at the time

33

they rendered their opinions.[19]  It is also undisputed the RFC is inconsistent with these

physicians' opinions in numerous respects.  Specifically, the RFC does not accommodate Dr.

Calabrese's opinion Weiland could never carry 20 pounds and only rarely lift and carry 10

pounds; stand/walk for a total of less than 2 hours in an 8 hour workday; and sit for less than 2

hours in an 8 hour workday.  (Tr. 983-984.)  The RFC also rejects Dr. Calabrese's opinion

Weiland would need to shift positions at will; would need to walk for five minutes every thirty

minutes during the workday; and could rarely climb stairs and only occasionally twist, stoop, and

crouch/squat.  (*Id*.)  Finally, the RFC fails to accommodate the opinions of both Dr. Jeet and Dr.

Calabrese that Weiland would need additional, unscheduled breaks during the work day.  (Tr.

983, 468.)  Nor does it reflect Dr. Calabrese's opinion Weiland would be off-task 15% or more of

a typical workday and would likely be absent from work about three days per month.  (Tr. 985.)

The Court first finds the ALJ failed to articulate "good reasons" for rejecting Dr.

Calabrese's opinion.  The ALJ provides no specific reasons for rejecting Dr. Calabrese's lifting,

standing, walking, and postural limitations, or her opinions Weiland would require unscheduled

breaks every one to hours and would be off-task 15% of the work day, stating only "the

preponderance of the evidence supports a light exertional level."  (Tr. 31.)  Similarly, the ALJ

rejects Dr. Calabrese's opinion Weiland would miss three days of work per month and could only

work 15-20 hours per week, on the unexplained basis there is "insufficient evidence in the record"

to support these limitations.  (*Id*.)  At no point in the decision, however, does the ALJ identify any

---

[19] Indeed, the record reflects that, between August 2012 and January 2014, Dr. Jeet
treated Weiland on at least seven (7) occasions.  Moreover, the parties do not dispute Dr.
Calabrese was Weiland's long-time primary care physician and had treated her for ten
years for her various conditions, including complications arising from her type 1 juvenile
diabetes, at the time she authored her February 2016 opinion.

particular evidence supporting a light exertional level or otherwise explain how the record evidence is inconsistent with Dr. Calabrese's opinions regarding these particular limitations.

The only basis provided by the ALJ for discounting Dr. Calabrese's opinions is the unexplained statement that "the record documents the claimant is currently working part-time." (Tr. 31.)  While Weiland testified she currently worked three days per week at Target, the ALJ fails to address Weiland's testimony she experiences blood sugar "episodes" once or twice per eight hour workday, which cause her to slur her words, stagger, and feel confused and disoriented.  (Tr. 64, 68-69.)  Weiland explained Target generally accommodates her condition by allowing her to take additional, unscheduled breaks when she experiences a drop in her blood sugar.  (Tr. 68-69.)  Under these circumstances, and absent any further explanation by the ALJ, the Court finds Weiland's ability to work part-time with the accommodation noted above does not constitute a "good reason" for rejecting Dr. Calabrese's opinion.

The Court also finds the ALJ failed to articulate "good reasons" for rejecting Dr. Jeet's opinion.  Although the ALJ purports to accord "considerable weight" to this opinion, it is undisputed the ALJ rejected Dr. Jeet's opinions Weiland would (1) need additional, unscheduled breaks to check her blood sugar, and (2) have up to two absences per month due to "blood sugar problems."  (Tr. 468-469.)  The ALJ fails to provide any meaningful explanation for rejecting Dr. Jeet's opinion regarding the need for unscheduled breaks, stating only there is "insufficient evidence" to support this limitation.  Again, however, the ALJ does not identify any particular evidence that is inconsistent with Dr. Jeet's opinion or otherwise discuss the medical record in the context of rejecting this particular limitation.

The only specific reason provided by the ALJ relates to Dr. Jeet's opinion Weiland

35

would have two absences per month due to complications arising from her diabetes. The ALJ rejects this opinion on the ground Weiland could arrange her absences during "off work time." (Tr. 30.) The ALJ does not explain, however, how Weiland would be able to "arrange" a problem with her blood sugar so as to avoid work hours, particularly in the context of full-time work. Nor does the ALJ address the issue of the unpredictability and frequency of Weiland's blood sugar episodes, as described in both Weiland's hearing testimony and Dr. Calabrese's conclusion Weiland suffers from "unpredictable sugar fluctuations and strain." (Tr. 982.)

The ALJ's failure to provide reasoned explanations for rejecting the opinions of Drs. Calabrese and Jeet is problematic because the medical record contains evidence potentially consistent with those opinions. As noted *supra*, Weiland's treatment records reflect she consistently complained of fatigue, dizziness, blurred vision, and headaches. (Tr. 549, 553, 557, 562, 699-700, 702, 749, 575,772, 887, 883, 876, 1027-1028, 1016-1017.) During the hearing, Weiland testified she frequently experiences episodes where her blood sugar drops too low, resulting in slurred speech, confusion, and staggering. (Tr. 64, 68-69.) This is consistent with Dr. Jeet's treatment notes, which reflect Weiland suffered from hypoglycemic episodes as well as very high glucose and hemoglobin A1c levels. (Tr. 549, 553-555, 464-465, 565-567, 699-700, 748-749, 575-577, 771-774, 886-889, 1027-1029, 1021-1024.) Indeed, while her symptoms fluctuated somewhat, Weiland's diabetes was consistently diagnosed as uncontrolled beginning as early as 2014. (Tr. 576, 582, 587, 769, 773, 888, 884, 856, 1029, 1019.) The record reflects Weiland was, in fact, hospitalized at least twice for diabetic ketoacidosis, a potentially serious condition during which her glucose levels reached as high as 593 and 528. (Tr. 422-426, 445-446, 451-452.) Moreover, each of Weiland's treating sources (Drs. Jeet, Calabrese, and

36

Studer) opine Weiland would require unscheduled breaks and would be absent from work due to her physical impairments.  (Tr. 467-468, 922-925, 982-985.)

The ALJ does not sufficiently explain how, in light of the above, there is "insufficient evidence" to support the opinions of Drs. Jeet and Calabrese.  The Sixth Circuit has made clear an ALJ's conclusory and unexplained statement that a treating physician opinion is inconsistent with the medical evidence does not constitute a "good reason" for rejecting these opinions.  *See, e.g., Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 552 (6th Cir. April 28, 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick"); *Rogers*, 486 F.3d at 245-246 (finding an ALJ failed to give "good reasons" for rejecting the limitations contained in a treating source's opinion where the ALJ merely stated, without explanation,  that the evidence of record did not support the severity of said limitations); *Bartolome v. Comm'r of Soc. Sec.*, 2011 WL 5920928 (W.D. Mich. Nov. 28, 2011) (noting that merely citing to "the evidence" and referring to the appropriate regulation was insufficient to satisfy the "good reasons" requirement); *Patterson v. Astrue*, 2010 WL 2232309 (N.D. Ohio June 2, 2010) (remanding where the "ALJ did not provide any rationale beyond his conclusory statement that [the treating physician's] opinion is inconsistent with the objective medical evidence and appears to be based solely on [claimant's] subjective performance."); *Fuston v. Comm'r of Soc. Sec.*, 2012 WL 1413097 (S.D. Ohio Apr. 23, 2012) (finding the ALJ deprived the court of meaningful review where the ALJ discarded a treating physician's opinion without identifying any contradictory evidence or explaining which findings were unsupported).

The Commissioner nonetheless argues remand is not required because, reading the decision as a whole, the ALJ's discussion of the medical evidence provides support for his rejection of the opinions offered by Drs. Jeet and Calabrese.  The Court rejects this argument. While the ALJ recited some of the medical evidence earlier in the decision, he failed to offer any *explanation* for his conclusion that the opinions of Drs. Jeet and Calabrese were inconsistent with that evidence.  This is significant because the medical evidence discussed above appears capable of supporting serious functional limitations.  As courts within this District have held, an ALJ's recitation of the medical evidence "does not cure the failure to offer any meaningful analysis as to why the opinions of treating physicians were rejected."  *Blackburn v. Colvin*, 2013 WL 3967282 at * 7 (N.D. Ohio July 31, 2013).  Simply put, this Court cannot conduct a meaningful review and conclude that good reasons have been set forth for rejecting a treating physician's opinion where an ALJ recites some of the pertinent evidence of record and follows that recitation with an unexplained conclusion that said opinion is inconsistent with the medical record.  *See Blackburn*, 2013 WL 3977282 at * 7; *Cassels v. Comm'r of Soc. Sec*., 2016 WL 3097150 at * 4 (S.D. Ohio June 3, 2016) ("The ALJ, for example, 'does not offer any explanation for his conclusion' that 'the treating physician's opinions were inconsistent with the medical evidence,' which is enough by itself for error.") (quoting *Blackburn*, 2013 WL 3977282 at * 7); *Sacks v. Colvin*, 2016 WL 1085381 at * 5 (S.D. Ohio March 21, 2016) ("[A]lthough the ALJ made a general statement about inconsistencies between Dr. Bhatia's opnions and the 'medical evidence of record,' it was just that - a general statement devoid of any specific reference to any portion of the medical evidence. Such conclusory statements do not provide the claimant with any ability to understand their content, nor do they provide a reviewing court with the ability to decide if the ALJ correctly or

38

incorrectly assessed those claimed inconsistencies.").

The Commissioner also argues the ALJ properly rejected the opinions of Drs. Jeet and Calabrese in light of "Plaintiff's normal examinations, her routine and conservative treatment, her improvement with treatment, her failure to follow the recommended treatment plan, her daily activities . . . , and the medical opinions of the State Agency medical consultants." (Doc. No. 15 at 24.)  However, the ALJ did not articulate these as reasons for rejecting the opinions at issue and the Commissioner cannot cure a deficient opinion by offering explanations never offered by the ALJ.  As courts witin this District have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration."  *See, e.g., Blackburn*, 2013 WL 3967282 at *8; *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012).

In sum, the Court finds the ALJ's decision fails to set forth "good reasons" for discounting the opinions of Drs. Jeet and Calabrese.  Moreover, this portion of the decision is so conclusory and devoid of explanation that it deprives this Court of the ability to conduct a meaningful review.  Accordingly, the Court recommends a remand is necessary, thereby affording the ALJ the opportunity to sufficiently and more thoroughly address the physical functional limitations assessed by Drs. Jeet and Calabrese.[20]

---

[20]  The Commissioner does not argue the ALJ's failure to give good reasons for rejecting Dr. Jeet's and Dr. Calabrese's opinions is harmless error.  Regardless, any such argument would be without merit in light of the VE testimony that no jobs would be available for an individual with the restrictions offered by Drs. Jeet and Calabrese.  (Tr. 80-81.)

***Evaluation of Weiland's Diabetes***

Weiland next argues the ALJ failed to properly evaluate the impact of her Type 1 Diabetes Mellitus at either step three or step four.  (Doc. No. 14 at 12-18.)  Specifically, she maintains the ALJ failed to evaluate her diabetes under Social Security Ruling 14-2p, which "requires an ALJ to consider that the combined effects of diabetes and another impairment(s) can be greater than the effect of each of the impairments considered separately."  (*Id*.)  Weiland asserts the ALJ understated the effect of her physical and mental limitations on her ability to work full-time because he "failed to evaluate the evidence of record supporting the frequency, severity, and duration of her diabetic episodes and symptoms."  (*Id*. at 18.)  Moreover, she claims "the ALJ's characterization of [her] condition was incomplete, because it failed to include seven specific impairments:  fatigue, neuropathy, dizziness, frequent headaches, blurry vision, nausea and vomiting, and mood changes."  (*Id*.)

The Commissioner argues the ALJ properly evaluated Weiland's symptoms throughout the sequential evaluation process.  (Doc. No. 15 at 15-22.)  With regard to step three, she maintains the ALJ properly found none of Weiland's impairments met or equaled the requirements of any listed impairment.  (*Id*. at 15.)  Although the ALJ incorrectly referenced SSR 14-3p (which relates to endocrime disorders rather than diabetes), the Commissioner notes the ALJ also cited SSR 14-2p and properly considered Weiland's diabetes symptoms under all of the applicable listings in Section 9.00, as well as Listing 11.14 (relating to peripheral neuropathy).  (*Id*. at 16.)  The Commissioner asserts the ALJ appropriately found Weiland's diabetes failed to satisfy the requirements of Listing 11.14, as the record contains no evidence of gait abnormalities and no physician indicated Weiland required an ambulatory device.  (*Id*.)

40

With regard to step four, the Commissioner argues the ALJ properly considered all of Weiland's diabetes symptoms in formulating the RFC.  (*Id*. at 17.)  She maintains the ALJ expressly discussed Weiland's hypoglycemic episodes, uncontrolled diabetes, memory loss, fatigue and neuropathy.  (*Id*. at 18.)  The Commissioner recognizes the ALJ did not discuss each and every one of Dr. Jeet's treatment notes but asserts "the ALJ was not required to discuss each notation in the record."  (*Id*.)  The Commissioner argues the ALJ thoroughly considered the medical evidence and, further, that substantial evidence supports the RFC.

The Court will address each of Weiland's arguments, in turn.

### Step Three

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a), 416.925(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3).  It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment.  *See e.g. Lett v. Colvin*, 2015 WL 853425 at * 15 (N.D. Ohio Feb. 26, 2015).  A

41

claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision. *Id.* at 416-17.

Here, the ALJ found Weiland's impairments did not meet or equal the severity of one of the listed impairments, as follows:

> No treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment. In reaching the conclusion that the claimant does not have an impairment or combination of impairments that meet or medically equal a listed impairment, the undersigned also considered the opinion of the State Agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion (20 CFR 404.1527(f), 416.927(f) and Social Security Ruling 96-6p). The undersigned considered listings 9.00, 11.14, 12.04, 12.06, section 1.00Q, SSR 02-1p and SSR 14-3p in reaching this finding.
>
> The undersigned considered all the listings under section 9.00, which covers the endocrine disorder (hypothyroidism). Upon review of these listings, the claimant does not meet any listing in this section. The undersigned finds that the claimant's diabetes mellitus has not caused listing level end organ damage such as amputation, retinopathy, coronary artery disease, peripheral vascular disease, gastroparesis, nephropathy, skin infections, neuropathies, or problems with

cognition, depression, or anxiety (see 9.00(B)(5), SSR 14-2p and SSR-3p).

The undersigned considered SSR 14-3p, which deals with endocrine disorders, regarding the claimant's diabetes mellitus.  SSR 14-3p directs that endocrine disorders be evaluated under the listing for the body system affected by the endocrine disorder, such as peripheral neuropathy.  There is evidence of peripheral neuropathy in the record.  The undersigned considered Listing 11.14, which deals with peripheral neuropathy.  In order to meet the criteria of Listing 11.14, there must be evidence of significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements or gait and station.  The record contains no objective evidence of abnormalities of gait or station.  No physician has indicated that the claimant requires an ambulatory device.  The evidence does not establish sustained disturbance of gait and station due to peripheral neuropathy.

The claimant's impairments failed to meet Listing 11.14 (Peripheral neuropathies) because the record, consistent with the findings below, does not demonstrate significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station, in spite of prescribed treatment.

(Tr. 23-24.)  The ALJ then went on to find Weiland's mental impairments did not meet or equal the requirements of Listings 12.04 and 12.06.  (Tr. 24-25.)

Weiland argues remand is required because the ALJ improperly evaluated her impairments under SSR 14-3p (relating to endocrine disorders) rather than SSR 14-2p (relating to diabetes mellitus).  For the reasons set forth below, the Court disagrees.  At step three, the ALJ repeatedly cites to SSR 14-3p, which "provides information about endocrine disorders other than diabetes mellitus (DM), and explains the types of impairments and limitations that result from those disorders."  SSR 14-3p, Purpose. (emphasis added).  As Weiland correctly notes, the ALJ should have cited SSR 14-2p, which "provides information about the types of impairments and limitations that result from diabetes mellitus (DM)" and "provides guidance on how we evaluate DM in disability claims under titles II and XVI of the Social Security Act (Act)."  SSR 14-2p, 2014 WL 2472008 at * 1.  SSR 14-2p describes the symptoms of both Type 1 and Type 2

diabetes and discusses a number of complications that may result from DM, including

hyperglycemia, hypoglycemia, diabetic ketoacidosis, diabetic retinopathy, cardiovascular disease,

diabetic nephropathy, and diabetic neuropathy.  *See* SSR 14-2p, 2014 WL 2472008 at *2-5.  With

regard to the evaluation of diabetes at step three, SSR 14-2p provides as follows:

> We next determine at step 3 whether the impairment(s) meets or medically equals
> a listing, which also considers the medical severity of your impairment(s). **DM is
> not a listed impairment for adults.  However, the effects of DM, either alone
> or in combination with another impairment(s), may meet or medically equal
> the criteria of a listing in an affected body system(s)**. [footnote omitted]. Below
> are some examples of the effects of DM and the body systems under which we
> evaluate them:
>
> • Amputation of an extremity, under the musculoskeletal system listings
>   (1.00).
>
> • Diabetic retinopathy, under the special senses and speech listings (2.00).
>
> • Hypertension, cardiac arrhythmias, and heart failure, under the
>   cardiovascular system listings (4.00).
>
> • Gastroparesis and ischemic bowel disease (intestinal necrosis), under the
>   digestive system listings (5.00).
>
> • Diabetic nephropathy, under the genitourinary impairments listings
>   (6.00).
>
> • Slow-healing bacterial and fungal infections, under the skin disorders
>   listings (8.00).
>
> • **Diabetic neuropathy, under the neurological listings (11.00).**
>
> • Cognitive impairments, depression, anxiety, and eating disorders, under
>   the mental disorders listings (12.00).

SSR 14-2p, 2014 WL 2472008 at * 6. (emphasis added).

Here, while the ALJ herein incorrectly referenced SSR 14-3p, the Court finds any error

to be harmless because, consistent with SSR 14-2p, the ALJ evaluated Weiland's disorder under

the applicable listings for the body system affected by her diabetes.  Specifically, the ALJ

considered Weiland's peripheral neuropathy under Listing 11.14, which provides as follows:

> 11.14 Peripheral neuropathy, characterized by A or B:
>
> A. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities; or
>
> B. Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), and in one of the following:
>
>> 1. Understanding, remembering, or applying information (see 11.00G3b(i)); or
>>
>> 2. Interacting with others (see 11.00G3b(ii)); or
>>
>> 3. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
>>
>> 4. Adapting or managing oneself (see 11.00G3b(iv)).

Listing 11.14.  "Disorganization of motor function," in turn, is defined as follows:

> 1. Disorganization of motor function means interference, due to your neurological disorder, with movement of two extremities; i.e., the lower extremities, or upper extremities (including fingers, wrists, hands, arms, and shoulders).  By two extremities we mean both lower extremities, or both upper extremities, or one upper extremity and one lower extremity.  All listings in this body system, except for 11.02 (Epilepsy), 11.10 (Amyotrophic lateral sclerosis), and 11.20 (Coma and persistent vegetative state), include criteria for disorganization of motor function that results in an extreme limitation in your ability to:
>
>> a. Stand up from a seated position; or
>>
>> b. Balance while standing or walking; or
>>
>> c. Use the upper extremities (including fingers, wrists, hands, arms, and shoulders).
>
> 2. Extreme limitation means the inability to stand up from a seated position, maintain balance in a standing position and while walking, or use your upper extremities to independently initiate, sustain, and complete work-related activities. The assessment of motor function depends on the degree of interference with standing up; balancing while standing or walking; or using the upper extremities (including fingers, hands, arms, and shoulders).

a. Inability to stand up from a seated position means that once seated you are unable to stand and maintain an upright position without the assistance of another person or the use of an assistive device, such as a walker, two crutches, or two canes.

b. Inability to maintain balance in a standing position means that you are unable to maintain an upright position while standing or walking without the assistance of another person or an assistive device, such as a walker, two crutches, or two canes.

c. Inability to use your upper extremities means that you have a loss of function of both upper extremities (including fingers, wrists, hands, arms, and shoulders) that very seriously limits your ability to independently initiate, sustain, and complete work-related activities involving fine and gross motor movements. Inability to perform fine and gross motor movements could include not being able to pinch, manipulate, and use your fingers; or not being able to use your hands, arms, and shoulders to perform gross motor movements, such as handling, gripping, grasping, holding, turning, and reaching; or not being able to engage in exertional movements such a lifting, carrying, pushing, and pulling.

Listing 11.00D.

Here, the ALJ properly determined the record "did not demonstrate significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station, in spite of prescribed treatment."  (Tr. 24.) As noted *supra*, the record reflects Weiland's physical examinations were largely normal and consistently included findings of normal gait and station.  (Tr. 549-550, 554, 558, 696, 700,749, 772, 887, 855-856, 849-850, 948-949, 1023, 941-942.)  Notably, Weiland does not direct this Court's attention to any medical evidence demonstrating she was unable to stand up from a seated position or maintain balance in a standing position or while walking sufficient to satisfy the above Listing, nor does she identify any evidence she was prescribed or required the use of an assistive device, such as walker, two crutches, or two canes.

With regard to her upper extremities, Weiland was diagnosed with carpal tunnel

46

syndrome and testified she experienced numbness, tingling, and decreased sensation in several of her fingers bilaterally.  Weiland does not, however, direct this Court's attention to any medical evidence indicating this condition "seriously limit[ed] [her] ability to independently initiate, sustain, and complete work-related activities involving fine and gross motor movements."  Listing 11.00D2(c).  Indeed, as the ALJ notes later in the decision, Weiland's long time primary care physician, Dr.Calabrese, expressly found she had no significant limitations with reaching, handling, or fingering.  (Tr. 984.)  Weiland's treating chiropractor, Dr. Studer, also reached the same conclusion.[21]  (Tr. 924.)

In sum, the Court finds that, while the ALJ referenced the incorrect SSR, he nonetheless properly considered Weiland's diabetes under the applicable listings for the body system affected; i.e., Listing 11.14 for peripheral neuropathy.  As set forth above, the ALJ's determination Weiland did not meet or equal the severity of this Listing is supported by substantial evidence, including Weiland's consistently normal physical examination findings and the opinions of State agency physicians Drs. Prosperi and Hinzman.  Moreover, Weiland does not argue the ALJ improperly failed to consider any other specific listing(s) relating to her type 1 diabetes.

Accordingly, this assignment of error is without merit.

---

[21] Weiland does not expressly argue the ALJ improperly determined she failed to meet or equal Listing 11.14B.  Regardless, any such argument would be without merit.  Listing 11.14B requires a showing of a "marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), and in one of the following: 1. Understanding, remembering, or applying information (see 11.00G3b(i)); or 2. Interacting with others (see 11.00G3b(ii)); or 3. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or 4. Adapting or managing oneself."  Here, Weiland has not argued or demonstrated she has a "marked limitation in physical functioning" as those terms are defined in the regulations.  Moreover, while Weiland complained of memory loss, she has not argued or demonstrated she has a "marked limitation" in "understanding, remembering, or applying information," as those terms are defined in the regulations.

47

*RFC*

Finally, Weiland argues the ALJ failed to properly evaluate the impact of her Type 1 Diabetes Mellitus when formulating the RFC by understating and/or failing to address her fatigue, neuropathy, dizziness, frequent headaches, blurry vision, nausea and vomiting, and mood changes. (Doc. No. 14.) The Commissioner argues the RFC is supported by substantial evidence. (Doc. No. 15.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 SSR LEXIS 5 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F.Supp.2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed.Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p at *7, 1996 SSR LEXIS 5 at *20 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC

48

assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

As the undersigned has recommended this matter be remanded for further consideration of the opinions of treating physicians Drs. Jeet and Calabrese, it is possible the ALJ's RFC determination may change on remand.  Thus, the Court will not address all of the parties' arguments regarding the alleged deficiencies in the ALJ's discussion of the medical evidence at step four.  On remand, however, it is recommended, the ALJ conduct a thorough and complete review of the medical evidence relating to Weiland's diabetes, including evidence relating to the nature and frequency of her blood sugar "episodes," as well as her complaints of fatigue, neuropathy, dizziness, frequent headaches, blurry vision, and memory loss.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends the Commissioner's final decision be VACATED and the case REMANDED for further consideration consistent with this decision.

  *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: February 28, 2018

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474**

49

**U.S. 1111 (1986).**